We have four argued cases this morning. The first one is number 18-1250 Mid-Continent Steel & Wire v. United States. Mr. Gordon. Good morning, Your Honors. May it please the Court. My name is Adam Gordon from the Bristol Group. I'm here today on behalf of Plaintiff Appellant Mid-Continent Steel & Wire, Incorporated. Our appeal arises from an anti-dumping duty investigation concerning imports of steel nails from the Sultanate of Oman. Specifically, we challenge a determination by the Department of Commerce that the respondent in the case, Oman Fasteners, is not affiliated with a U.S. customer by virtue of a close supplier relationship arising under 19 U.S.C. 1677-33-G. Specifically, we believe that the determination by Commerce and as affirmed by the Court of International Trade is flawed both legally and factually. Legally, the Commerce Department applied a standard requiring actual control, which is contrary to the statute, the specific statements of the Statement of Administrative Action, the Commerce Department's own regulations, and the preamble accompanying Commerce's current regulations. The evidence of the improperly applied standard is apparent throughout the decision by the Commerce Department in its memoranda and also in the Court of International Trade's decision below. Can I just ask you, in the contract, which I think the supply agreement, which I think is not confidential, the pricing term says something, Section 3.1 says pricing follows market prices of steel or something to that effect. So there's no fixed price for the full term of the contract, right? That's correct, Your Honor, yes. And the contract expressly contemplates the possibility that an offer to buy from the customer could be rejected by Oman Fasteners. Well, it doesn't rule that out, for sure. But I think it's important to bear in mind that a close supplier relationship doesn't require that you have a fixed price or fixed pricing. What it requires is the potential to exercise restraint or direction over a company's decisions concerning production, cost, or pricing. And how does that exist here? Pardon me, sir? How does that exist here? The specific provisions of the supply agreement do give rise to an actual ability to control or exercise restraint or direction. Which provisions, the priority provision? Yes, Your Honor. But there are certain parts of that that are confidential. So there's a provision that you referred to that does give rise to that. That provision is always in effect at all times and applies to all orders placed by the U.S. customer. So whether it's been actually invoked is not a question because it's always in play. And that's what the statute requires is the potential to exercise control. In this case, the potential to exercise control over production exists all the time. Just because of the priority provision? I don't know that any more would be necessary for that, Your Honor. That is a legally enforceable contractual provision between the parties. And as a matter of law, what is required here is the potential to exercise direction or restraint or direction over production, which exists here, cost, or pricing. Can I ask you this question that's, like I said, I'm puzzled about? So we have a situation in which on the U.S. side of this transnational process, there's a concern about affiliation, potential control. And here it's on the concern, the allegation is that the customer has the potential to control the supplier. If a customer has a potential to control the supplier, that would naturally lead the customer to want low prices, which would tend, therefore, to increase the dumping margin. What is the domestic, your client's, concern with an increase in the dumping margin? Well, I think it's not merely – the dynamic doesn't merely rely on a desire for lower prices. As you can tell from the provision that was just referred to, part of this will be knowing that you have reliable continuity of supply without any potential supply interruptions. That's extraordinarily valuable to a U.S. customer, especially one who is importing products from overseas, where supply chain interruptions can be a nightmare. So from my client's point of view, we see this relationship giving rise to the potential to facilitate increased imports at whatever price and increased volumes of those imports, which harm the market. And so that's kind of how this provision, I think, is intended to function. It specifically broadened the definition of affiliation in order – because, as it said, the traditional focus on stock ownership alone, equity relationships, fails to address adequately modern business relationships, which often find one firm operationally in a position to exercise restraint or direction over another firm, even in the absence of an equity relationship. There are many facets to the relationship. It's not merely just – price drives many decisions, but price is irrelevant if you don't have continuity of supply. So as a matter of law, we believe the Commerce Department applied the wrong standard. It's very clear on the face of the record below. The determination below is also flawed factually. The statute gives reference to the fact that a close supplier relationship is one in which one firm is reliant upon the other. And the evidence below is abundantly clear that Oman Fasteners is reliant or was reliant during the period of investigation on the U.S. customer. This is a brand-new nail producer in Oman who could not produce nails prior to its founding in 2012, who sold an extraordinary supermajority of its entire global production to one single customer in the United States. Why does a high percentage of sales to one customer necessarily implicate control rather than just a market desire to please one customer? Well, the extraordinarily high level of sales to the one customer, Your Honor, gives rise to a relationship of reliance. And after reliance, you look at the question of control. Control is abundant. It can't be that just relying on a customer indicates control, right? That wasn't the purpose of the provision here. No, but it's part of it, Your Honor, and it's part of what the Commerce Department examines. We're not challenging the regulation as it's intended to be applied. We're challenging how it was implied here. And when you look at the volume, the percentage of sales made to this single customer by a company who didn't exist before 2012, and you look at it in terms of the temporal aspect of it, subject to a long-term supply agreement, there's no way this relationship could easily be replaced. Well, it's a holistic inquiry, and Commerce looked at all of the facts before it and found that there was no control. You're attempting to invoke some sort of a per se rule, it seems to me, and I'm not sure there's warranty. I'm not certain we're trying to invoke a per se rule, Your Honor. But what we do believe firmly is that the record here is compelling. Frankly, you look at the evidence on the record below, and if you can't find close supplier affiliation on these facts, we don't know when you can. It's a very clear-cut case, not only factually but also in terms of what the law requires. It appears to us that the Commerce Department's approach here was ends-oriented to try to avoid this finding, and that's partly why it concerned us enough to bring the appeal not only to the Court of International Trade but before this Court. Okay, you're in your ball time. Do you want to save that? Apologies, Your Honor. I didn't mean to use that. Thank you very much. Ms. Cotter? Mickey Cote for the United States. The trial court correctly sustained Commerce's determination that Oman Fasteners is not affiliated with U.S. customer. Because Commerce's determination is supported by substantial record evidence and is otherwise in accordance with the law, this Court should sustain or affirm the trial court's decision and sustain Commerce's affiliation determination. Commerce's affiliation determination was—and I'll address the legal issue first and then the factual issue second, Your Honors— was made consistent with statutory requirements of 19 U.S.C. section 1677-33. It was consistent with the guidance provided by the SAA. It was consistent with its regulations at 19 C.F.R. section 351.102b. And notwithstanding the arguments that are made by Mid-Continent, the trial court and Commerce fully reviewed the law and Commerce responded to each and every one of the allegations that Mid-Continent made during the administrative proceedings. Commerce made a determination that was squarely within the scope of the law. It made a determination that there was no affiliation here based upon the entirety of the record. And that entire record included the submissions by Oman Fasteners, as well as the supply agreement, as well as a complete and thorough verification reviewing accounts and records of Oman Fasteners, as well as reviewing their production. With respect to the facts, the facts, as they are revealed in the record, demonstrate there was substantial evidence supporting Commerce's position. That substantial evidence supported Commerce's determination that there was no exclusive relationship. Oman Fasteners had customers in addition to U.S. customers. Tiny volumes, right? Pardon me? Tiny volumes. Notwithstanding the fact that they were tiny volumes, comparatively speaking, with U.S. customers, they had other customers nonetheless. The contract... And the contract here didn't prohibit them from selling to other people. That's correct, Your Honor. Not only did it not prohibit them from selling to other people, but as the Court pointed out earlier, it permitted Oman Fasteners to reject an offer to buy. The contract itself demonstrated that two parties came together and agreed upon terms that were mutually agreeable to them and mutually beneficial to them both. Further, the one provision that was discussed earlier, which is the subject of BPI, and so I will not speak to the specifics of it, does not detract from the other sections of the contract, which demonstrate arm's-length transactions, that the prices are not fixed in favor of U.S. customer, and, in fact, further evidence demonstrated that those prices were consistent with the prices that other customers paid for the goods. Can I ask you, I guess, the question I asked Mr. Gordon, do you have a view about whether, here's one way to put it, whether the domestic industry is within the zone of interest protected by the affiliation standard when the affiliation is in the context on the domestic side, on the U.S. side of the ocean, and it's about the customer controlling the supplier, presumptively to get better terms, and I would have thought, at least in general, lower prices, which seems an odd thing for a domestic industry to be complaining about in a proceeding in which lower prices on the constructed export side or the export side would lead only to higher dumping budgets. I do not know the answer to your question, Your Honor. I wish that I did. It is not a part of the issues and decision memorandum, and I would not like to speculate as to that answer. For all of the reasons stated in our brief, as well as those that I've mentioned during this argument, we request that the court affirm the lower court's judgment and sustain Commerce's determination regarding affiliation. Thank you, Your Honor. Okay. Thank you, Mr. House. May it please the Court. My name is Michael House. I represent Oman Fasteners. I'm speaking now as a co-appellee in the case on the issue of affiliation. Just a couple of comments to Your Honor's question about the contract and the U.S. customers of Oman Fasteners. In our view, the appellate Midcontinent is seizing on one specific clause in a very large contract that overwhelmingly is a market-oriented contract. There are many provisions in that supply agreement that focus on the market determining the prices that the two parties must come to agreement on. The record also has evidence of Oman Fasteners rejecting offers made by their U.S. customer under this agreement. The record also has evidence of Oman Fasteners losing sales to this customer because the two parties could not come to agreement on price. So in our view, this is a market-oriented long-term supply agreement, not unusual. The Department looked at that along with the voluminous other record evidence of Oman Fasteners' commercial relationship with this customer. And as well, importantly, the Commerce Department looked at Oman Fasteners' commercial relationship with all of its other admittedly smaller U.S. customers. The on-site verification, as reflected in the record, shows Commerce examined not only records relating to Oman Fasteners' business with this customer, but its business with its other 12 U.S. customers and how its pricing was determined across all of those customer relationships. Thank you. Is that it? All right. Thank you. Thank you all, counsel. The first case is submitted. The second case this morning is the cross-appeal. In the same case, it's number 18-1296, Mid-Continent Steel & Wire v. United States. And this time, Mr. House goes first. Thank you, Your Honor. May it please the Court again. Michael House, I represent Oman Fasteners. In this cross-appeal, we asked the Court to require the Commerce Department to determine the profit of the constructed value of Oman Fasteners in this case, the way that the U.S. Congress plainly intended, which is a value based on evidence of the country under investigation, Oman, and, importantly, the specific product under investigation, steel nails, the foreign-like product. In this case, Commerce did neither one of those things. Instead, it chose to rely on a financial statement of a producer in a third country that makes no steel nails. On that question, would your position require us to say that the statute prohibited commerce from saying when you submitted as the only real alternative a partially translated document that commerce acted contrary to law in saying, sorry, we don't do documents we can't understand? No, Your Honor, I don't think we're going that far in our position here. I think what's important here is the context of when that document, that partially translated statement, was submitted to the Commerce Department by Oman Fasteners in this case. There is some reliance on Commerce having accepted it in the Chinese proceeding. Yes, Your Honor. Is your contention basically that Commerce was arbitrary and capricious in refusing to accept the fully translated document once it was apparent that Commerce wanted that in this proceeding? Yes, Your Honor, particularly in this case. There are cases that suggest that the refusal to reopen the record can be arbitrary and capricious action by an agency. The difficulty here, it seems to me, is that in the proceeding, you were not initially arguing that the LSI data should be used. You were only arguing that it corroborated the client's own data. Am I correct about that? Yes, Your Honor. In our initial submission of profit data on October 31st in this case, we included the partially translated LSI data financial statement as part of a larger record of profit determinations by the Commerce Department involving this product, Steel Nails. So given the limited purpose for which you were using the LSI data, maybe the refusal to reopen the record wasn't arbitrary and capricious. Well, Your Honor, I would submit that these are two different questions. The partially translated LSI statement, in fact, was on the record in our case here. We submitted it. And our position is that once it's on the record, Commerce has that information and should have relied upon it, given this is important to us, given its reliance on that same statement contemporaneously in another Steel Nails proceeding as the best evidence, and particularly in comparison to the high-tech statement that they rejected in those contemporaneous proceedings but applied here, leading to the anomalous profit rate that they used. But the requirement was that if you were going to rely on a document like that, you were required to submit a fully translated document. Is that correct? Your Honor. Isn't that what the rules say? The Commerce Department regulation does have a requirement about submitting fully translated documents, and it is the government's defense in this case that Oman Fasteners failed to meet that requirement. Our position is that in the context of this case, we were submitting evidence that was already on the record at the Commerce Department in the concurrent China Nails investigations, the same product. So we were submitting evidence, actually, that the Commerce Department already had in its hands in those concurrent proceedings. We were placing it on the record in this investigation. That goes back to the point that Judge Dyke was raising, that it's because you were just submitting that as sort of corroborate your other submissions, not as a separate matter of evidentiary consideration. Well, Your Honor, we think that it merits consideration as evidence. It was evidence that we submitted on the record, particularly when the Commerce Department had very imperfect options available to it in the home market and in third country markets. I hear you, but we've got a difficult standard of review to contend with. Yes, Your Honor. We understand the standard that the court must apply. In our view, the submission that our client made was consistent with what the Commerce Department was doing on this issue. That is to say, in October, at that time in this case, the Commerce Department was using that statement as a probative and best evidence measure of profit, and that's the spirit in which we submitted it. Can we turn to the profit cap? Because the same issue, it seems to me, arises in connection with the profit cap, where you did argue that they should use the LSI data as facts available. Yes, Your Honor. This is a complicated area. My understanding is that the Court of International Trade and other decisions has said that the profit cap has to be computed solely on home market data and that it can't use other country data, which the LSI data is. Doesn't that sort of sink you on that point? Well, Your Honor, there's no question that the record in this case is imperfect when it comes to data with respect to profit, constructed value of profit. And so what we would submit is that the profit cap provision of the statute is intended to keep the decision on this factual question within the bounds of a non-aberrational figure. Your contention is that Commerce is compelled, if necessary, to look outside the home market data, right? Well, Your Honor, the profit cap section does have two aspects to it. But I'm trying to just understand. Your position is they should have used the LSI data in computing the profit cap. And the fact that the LSI data was from another country doesn't mean that it's irrelevant to the profit cap calculation, correct? Not only the LSI data, but yes, Your Honor, the LSI data plus the data should be overlooked. We submitted data of other third, admittedly third country producers. So the question is, under the CIT cases, as I understand them, the other country data could not be used, even under the facts available theory, to calculate the profit cap. If my understanding of the other Court of International Trade cases is correct, you can only use home market data for calculating the profit cap. So under that line of cases, the LSI data would not have been relevant, right? Your Honor, I believe there are CIT cases to that effect. There are also CIT cases that considered Commerce using a broader, the Hugh Steele case in particular, the CIT looked at Commerce's use of a broader basket of profit rates to apply a cap. A broader basket of profit rates from other countries? Correct, yes, including the home market and other countries in that case. That's what Commerce did there, and Commerce decided that's our best approach to applying a cap. That's the Hugh Steele case. But our focus, and we think the Court's focus, should be on the fact that the statute has a overriding preference for non-aborational profit rates and rates that do reflect the foreign-like product, steel nails. And what the Commerce Department did here accomplishes neither one of those things. And our overall position is that this record, with the partial LSI statement, as well as the other China profit rate calculations that this agency performed, along with the home market data that the Commerce Department also had in front of it, provide a wealth of benchmarks that this agency could have relied upon and should have relied upon to ensure that it did not impose an aborational profit rate. And in our view, that's what the statute is all about, both the subsections of A and the three options under B for profit, as well as the cap provision. We also don't want to overlook the fact that the Commerce Department refused what we consider to be the very best evidence of home market profit, which are the sales by Oman fasteners in Oman, the country under investigation, of steel nails. Well, I think you may be right that the 5% provision doesn't apply here, to the extent that Commerce is using that to justify the decision. I'm a little skeptical about that, but there has to be some point at which Commerce could say, there's just not enough data here for us to calculate this reliably, and that's the situation that's what they said, right? Well, Your Honor, I mean, is your position that no matter how little data there is, that Commerce has to use that? We think what's important, Your Honor, is the quality of the data, and that's what the statute is getting after here. That is to say, if the home market data are small, but represent above-cost sales, represent sales that are not made to affiliates, and otherwise are not deficient in quality, the quantity, the quantitative volume of those sales can be quite small. I don't know if we're prepared to agree if there was a single sale that could be used, if it were qualitatively okay in those respects. But here we had more than... I'm not sure about what the basis for the quality-quantity distinction is. Isn't the idea here that if the sales are even just too few in number in Oman, that Oman fasteners could be perfectly happy living with an unduly small profit, because it's going to make up for it everywhere else it does business? So isn't there just a judgment call for Commerce to make? Whether it's 5% or, I mean, maybe 5% is arbitrary, but that's the concern, isn't it? Your Honor, I'm not sure we agree with that characterization of the profit section of the statute. Certainly there is a quantitative threshold in the price-to-price section of the statute. That is the threshold question about will the department, should the department... I think you're probably right about the 5% not carrying over to this section, but put that aside. What Judge Toronto is asking you is, isn't there some relevance to the small quantity of data that's available? Isn't it within Commerce's discretion to say there's just too little data here? However, Your Honor, the Commerce Department didn't do that in this case. They did not engage in any analysis of whether this number of sales were too small. They didn't engage in any analysis of the qualitative circumstances of these sales. They applied a bright-line rule in their decision. Our reading of their determination is that they said this falls under 5% redundancy. I don't see that in the decision. I don't see that they mentioned the 5% at all in the Commerce decision. They do in the brief here. They did in justifying it in the Court of International Trade, but I don't see in the Commerce decision itself that they relied on the 5% criteria. Your Honor, where we find that is the Commerce used the word viable in its underlying administrative decision. You think that that necessarily means 5%? Yes, Your Honor, because the Commerce Department, as a term of art administratively, uses the term viable to refer to cases where the 5% test is not met under that section of the statute. There are countless cases under which Commerce measures the home market against the 5% threshold. If it falls below that, they use the term non-viable to refer to that failure, that calculation below 5%. So in our view, when they said a non-viable home market, they were specifically referring to the calculation under that 5% threshold in that first part, the price-to-price part of the statute. Okay, unless there are other questions, I will give you two minutes for rebuttal. Could you maybe start with that last point? Do you read Commerce's decision here as applying a 5% criterion? Yes. You do? Really? It's less than 5%. It was... Without further inquiry? In this situation, it was not... I can't speak to any situation other than the determination that was made here, Your Honor. In this circumstance, the amount of sales were less than 5% for purposes of calculating normal value. They were negligible for purposes of calculating constructive value. So whether negligible was less than... If we say that there's no 5% bright line rule that's appropriate in this area, does that mean that we have to set aside Commerce's determination because it rests on that? Commerce's determination rests upon the facts of this case, which are that the sales in Oman by Oman fasteners were negligible. They're not... And by negligible, you mean not even in the neighborhood of 5%? Not even in the neighborhood of 5%. So you're saying that Commerce made its determination not by applying a strict 5% threshold, but by looking at the facts and reaching a determination that there was not enough data there to make a reasonable determination. That is 100% correct. So when you're starting with the 5% for purposes of normal value, they didn't have 5% for calculating normal value. But you keep coming back to the 5%. I think what we're trying to ask you... Which takes us to an alternate means of constructing value here. Let me be candid with you. I think that applying the 5% thing here is very questionable. What I'm trying to get at is whether Commerce's decision rests on applying a 5% bright line rule or whether, as I thought you just said, it rests on a more holistic determination that the data here weren't sufficient. Within the context of the determination made here, it was made based upon a holistic review of all of the data presented in this case. I cannot speak to a bright line rule, Your Honor. I can only speak within the context of the determination that was made here. And Commerce certainly did not state that it was making a bright line rule within the context of this case. So I would be uncomfortable making a hard and fast statement on behalf of the agency that the agency itself did not make in its determination here. Can I ask you a question on a different topic, which we haven't discussed this morning, but I came into the argument, I guess, having some concerns. And that's the question of Commerce's having decided that it would not, in this anti-dumping proceeding, consider whether the high-tech's profits were affected by subsidies. And as far as I can tell, neither in the Commerce decision at 4865 nor in your brief, which probably wouldn't substitute for it anyway, does Commerce actually give a reason for why that is reasonable. All it does is say, we don't do that in anti-dumping cases. And we've certainly said that the fact that an agency statement of what it normally does or has done before is not the same thing, an explanation of why it's reasonable. And I don't see an explanation of why it's reasonable. I thought we did address that in our brief. But this is a market economy case. The statute refers to- If you're trying to determine whether high-tech's profits, what they are, as a tool for saying, here's what the profits of Oman should be, how do you not take into account whether high-tech's country has given it wheelbarrows full of money that go into its profit, making them much too high? I believe that, and I don't have the record citation available to me, Your Honor, right now, but I believe that Commerce did state in the issues and decision memorandum that it took into account the subsidies that high-tech received. Now, there's a different- I don't recall that. Okay. So this is at 4865. Your brief actually cites a page that's not in the joint appendix, 3232 or something. Oh, I'm sorry. No, it's okay. But it's at 4865 of the appendix. It's really only, what, two paragraphs or something. And as far as I can tell, I guess I'd like to be shown why this is wrong, that the only thing that Commerce said is, our practice is not to consider this. Within the context of a case that involves a market economy, which is the case here, the subsidies do not have the same bearing that they would have within the context of a non-market economy case. Well, I mean, I think you're right in the sense that the statute, statutory prohibition, doesn't apply in these circumstances. But I think the question is, even apart from the statutory provision, isn't it perfectly evident that subsidies should be taken into account anyway? I don't know the answer to your question, Your Honor. I believe that within the context of the statute in a market economy, subsidies do not have the same red flag effect that they do in a non-market economy situation. Anything else that I say on this matter would be speculation on my part, because it is not in the issues and decision memorandum. However, I'd go further and state here that, based upon the record that was before Commerce, that was the only reasonable evidence upon which to make a determination regarding constructive value and a constructive value cap. I see that my time is up, and for all these reasons, Your Honor, and the reasons stated in our brief. Your time's up, but that doesn't give you the right to sit down. Okay. I was trying. Unless there are other questions about that. Let me ask you about the profit cap, because I'm not clear about what Commerce's position is here, as to whether it's appropriate under the FACTS available standard, which you seem to agree is appropriate, whether you can look to data outside the home market. Commerce's determination is made based upon the record that is before it. And here, the record that was before it did not provide it home market data from which it could make a determination regarding profit cap. The home market information that was provided by Oman Fasteners involved a steel and hollow company and a construction company. Okay, but I'm not really asking about that. They're arguing that the LSI data, and here, like their arguments made in connection with the preliminary determination, they did argue directly not to use the LSI data as corroboration, but to use it directly to create a profit cap. And, of course, the LSI data is from another country, and the question is, does Commerce agree that it's appropriate under the FACTS available standard to look to data from another country and calculate the profit cap? Yes, and it did so here. You do think it's appropriate? It calculated the profit cap based upon HITECH's information. HITECH is from another country. So, these are trade cases that say that's not appropriate. Commerce disagrees with those? Each Commerce case stands upon its own record. I cannot speak to the Court of International Trade cases to which the Court is referring, because those cases rested upon the evidence or the administrative record put before them by the parties to those cases. So, if that's the case, then, as Judge Toronto points out, your HITECH data is questionable because of the subsidies, and why wasn't it then an abuse of discretion not to consider the LSI data, fully translated data in that connection, given the unsatisfactory nature of the other data? For all the reasons why Commerce made a determination not to use the LSI data, whether it was submitted in the form of partially translated financial statements, or whether it was fully submitted translations, Oman fasteners submitted partially translated documents where substantial portions of it, audit reports, statements, and footnotes were missing. Translations. It is tantamount to being missing. I think Commerce's position about not relying on the not fully translated data is perfectly reasonable. That's not my question. I know. You were offered the full translation. It had been submitted in the China Nails docket, and given the fact that on the remand from the CIT, this profit cap issue was on the table again, why shouldn't, under those circumstances, Commerce have agreed to consider the late trial fully translated data? It is not an abuse of discretion. And the reason why I mentioned, I just want to point out, the LSI transcripts in connection with constructed value is because the constructed value profit cap follows that. So all of the reasons why Commerce made a determination not to use the LSI statements for constructed value are the very same reasons that it did not use the LSI statements for purposes of a profit cap. Commerce has a right, and this court should find it does, to have deadlines and require parties to abide by them. Commerce has regulations that, had they been employed here, we might not be talking about this. However, the circumstances presented here are that a party did not argue for something in a timely manner, did not address the LSI statements until after the record had closed. In fact, did not attempt to provide a full transcript, fully translated transcript, that it apparently had access to, because it was on the record in other proceedings, until three months after the deadline here. Commerce's discretion, and to add to that, Oman Fasteners had actually asked Commerce not to allow someone else, midcontinent, to file something in an untimely manner. All right, I think we're about out of time. Thank you. Thank you very much. Mr. Harris? Mr. Gordon. Mr. Gordon. I have you backwards. Okay, sorry. Your Honor, thank you. I would just like to offer a couple of points to follow up on what Ms. Cote had said. With respect to the LSI financial statement, it's a very straightforward matter, as she just described. Oman Fasteners chose to employ a certain litigation strategy through the preliminary phase of the underlying investigation, whereby they argued only that Commerce should rely on either their home market profit or profit rates from other Omani producers of completely different products, such as corrugated boxes, pipes and tubes, or a construction company. They submitted the LSI financial statement in a barely translated form. As Your Honors have said, expressly, and they declared this for purposes of benchmarking or corroborating what they argued would be a reasonable profit rate. It was only when they realized that their litigation strategy had failed in the preliminary determination that they then attempted to allege a ministerial error that Commerce hadn't examined the LSI statement, notwithstanding the fact that they had never argued that it should be used. They did argue that in connection with a profit cap, right? Only after the fact, not in the preliminary determination. Until that point, they had never argued that it should be used in any way except as a benchmark. They had access to the fully translated statement from a different proceeding. They chose not to put it on the record, but they didn't, I would argue, they didn't feel they needed to because they weren't putting it on the record for a substantive purpose. Every record of every proceeding stands on its own, and they chose what to put on the record here and only later tried to invent an issue to attempt to force Commerce to accept the document on the record, a fully translated version, or to reopen the record. As Ms. Cote mentioned, Omar Fassner strenuously argued against our ability to similarly submit a full translation of a financial statement for a company called Sumico after the deadline had passed, and they won. Commerce rejected our request as well. Commerce rejected both parties' requests to untimely present new factual information. That is within Commerce's purview as a matter of responsibly managing its docket. It was a hotly contested active investigation and litigation. Commerce needs to draw lines about what to take and what not to. In the case of a company who puts information on the record for a totally unrelated purpose and only after it realizes its litigation error, its failure in tactics, that it tries to get the Commerce Department to accept it for a different purpose, I think there's a sound basis for Commerce to exercise its discretion to reject this information. Do you have anything to add on the subsidy question? Yes, Your Honor. Commerce has a very reasonable practice of not looking beyond the financials, beyond the numbers of a financial statement. The Department doesn't want to put itself in the position of having to deconstruct financial statements and look behind or try to look behind the numbers. The statutory prohibition on avoiding financial statements from subsidized companies is specific to non-market economy cases. In a market economy case, especially on a record like the one below, where Commerce is faced with a set of imperfect choices, it was reasonable to accept the financial statement as presented. So you seem to be saying they have a policy of refusing to consider subsidies in market economy cases. That is their practice. But what I was actually saying is they have a practice also of not trying to deconstruct financial statements and fix problems or adjust the financial statement numbers. Hindsight is 20-20. The record in this investigation contained a series of difficult choices and a very badly developed record from the point of view of Oman Fasteners with respect to CB profit sources. But the fact that the best choice on the record was HITECH is not the Commerce Department's fault. We put HITECH on the record as the best source we could. Oman Fasteners failed to present information that it had access to. So that is not our basis for criticizing the Commerce Department when it manages its administrative process. The HITECH profit rate is pretty high compared to what you might expect for this kind of commodity product, right? It is higher than some of the other sources on the record. However, there have been many cases where Commerce has, and the Court of International Trade has affirmed it. Merely because a profit rate is high doesn't mean that it's aberrational. All right. Thank you, Mr. Gordon. Mr. Haas? Thank you, Your Honors. A couple of quick points in rebuttal. First of all, we can't find on the question of Commerce saying that it concluded Oman Fasteners sales were negligible. We can't find that word in the record. Don't they give a number? I don't think we're allowed to say the number, but don't they actually give a number in the record? I have a very small number. Correct, Your Honor. They do refer to the actual figure. But to us, it's clear that the decision-making rested entirely on their conclusion under the previous statutory section of what we call viability, what the Department calls viability. That is to say the 5% test. Because in their final decision memo, they said, because Oman Fasteners did not have a viable home market, and that reference in our view is a reference to the first statutory provision, the 5% test, because Oman Fasteners did not have a viable home market, that we consider the home market sales to be too insignificant. Those are the words they use, too insignificant to reflect a meaningful home market. But it reached that conclusion after looking at the data and concluding that there just wasn't enough data to reach a contrary conclusion. It seems to me that a fair way to read that is not to say that they simply applied a 5% threshold, but they looked at the record holistically, which they should. I agree, Your Honor. They should look at the record holistically. Our reading of this record is that on this question, they looked only at the outcome of the 5% test under the first part of the statute and decided that since Oman Fasteners fell below the 5% threshold under that portion of the statute, that meant that the sales were too insignificant, in their words, to be used in the CV profit part of the statute. And so we read that to mean a very mechanical right line per se application of the facts, of the numbers here in this case. Can I ask you just one more question on this subsidy point? If we were to remand and say, look, you actually haven't, e-commerce, haven't given an explanation for your exercising a judgment about what's reasonable and not reasonable in declining to inquire into whether there are subsidies that affect the profit margin in the third party document, would that be futile because we know what commerce will say, not just what they do, because they may be very consistently doing something unreasonable, so that's just not enough. But don't we know that they will say something like what Mr. Gordon says, which is not only do we not look behind these annual statements and audit reports and whatnot, but there's a good reason we don't, which is that if we did, we wouldn't have the same discovery tools. It would just be too difficult to make a reliable determination, in which case what would be the point of saying go back and say that? Your Honor, we do not think it would be futile to ask the Commerce Department to do that, particularly on the record of this case where the high-tech financial statement, as compared to the other evidence on the record, is so aberrational. And I would dispute the government. Are you arguing that the high-tech data should be adjusted by commerce to take account of the subsidies or that it should be discarded entirely because of the subsidies? Your Honor, in this case, we would argue it should be discarded entirely because there is better evidence on the record, which commerce indeed itself found, in comparing these two statements in the China Nails case. So in this case, we would argue that it should be discarded entirely. But I also take issue with the Commerce Department's and McConnell's characterization of the department never going behind statements. In fact, the reason why the Commerce Department has insisted so strenuously that it needs full translations of these statements is just so that it can examine the statements and decide whether they're probative or whether there's something about that company and its financials that prevent or distort the data that they're looking at. So that's the whole premise. The department says that it needs full translations. So looking at subsidies, it should be part of that inquiry, we believe. And we also want to finally note that with regard to McConnell's point about our objection to a late submission of a full translation on their part, when we asked the Commerce Department to please reopen the record to permit the full translation of LSI to be put on the record, we specifically said we would agree and we also urged them to open the record to have any other parties have the opportunity to submit full translations of what they felt was probative. So it was our position that Commerce should have taken an even-handed approach at that point in the investigation and permitted the parties to supplement the record in that fashion. Okay. Thank you very much. Thank you, Mr. Hess. Thank all counsel. The case is submitted.